JOHN D. WOOD, Administrator of ANNIE WOOD,
   v.   METROPOLITAN   STREET   RAILWAY
   COMPANY, Appellant.

**Division Two, May 10, 1904.**

1. **NEGLIGENCE: Station Platform: Duty of Railroad.** It is the duty of a street railway company to keep its platforms and approaches in such condition that passengers who have occasion to use them for the purpose for which they are designed, can do so in safety, and a passenger who is injured by a breach of this duty, without contributory negligence on his part, may maintain an action for damages against the company.

2. ———: Falling of Platform: Relation of Traveler. A passenger who has purchased a through ticket over the cable and electric lines of a street railway, entitling her to transfer from the cable to its electric line, and who at the transfer station goes upon the platform provided for passengers about to board the electric car, is entitled while on the platform to the care which the company owes a passenger.

3. ———: ———: Duty of Railway. The holder of a ticket who goes upon a street railway platform for the purpose of boarding a car, is there by invitation and contract, and from this contract flows the duty of the company to keep the platform in such condition that such person can safely pass over it to the car.

4. ———: ———: ———: Sufficient Evidence. The sub-structure of the platform under the floor of the station platform, which was sixteen feet above the ground, was rotten and doty, and not sufficient to support the weight of the crowd which was there to take passage on the train. There was evidence that these timbers could easily have been inspected by going under the platform, and taking a ladder and sounding the joists and stringers with a hammer. *Held*, that by establishing these facts and the further fact that while plaintiff was on the platform for the purpose of taking passage, the platform fell and injured her, plaintiff established a prima facie case of negligence against the railway company.

5. ———: ———: Peremptory Instruction for Defendant: Conflict of Evidence. Where there is a conflict of evidence, either as to the soundness of the timbers which supported the passen-
   Vol 181 mo—28

Wood v. Railway.

ger platform that fell and injured plaintiff, or as to the correctness of the method of inspecting them, the court should not give a peremptory instruction for defendant.

6. ——: ——: ——: Inspection. What is a proper inspection of the timbers supporting a passenger platform depends upon a variety of circumstances, and where under the circumstances it can not be said that a reasonable inspection would not have discovered their rotten and unsafe condition, the court can not say as a matter of law that the inspection made exonerated defendant.

7. ——: Cause of Injury: Conjecture. When a known and probable cause of plaintiff's nervous prostration and suffering is shown, she will not be denied a recovery from the defendant who caused the injuries, on the ground that some other cause or causes might also have produced the same condition.

8. HYPOTHETICAL QUESTION: Matter for Experts: Nervous Prostration. The symptoms and causes of nervous prostration are not sufficiently understood by the average juror to make incompetent the testimony of a medical expert as to what causes produced the disease.

9. ——: Cause of Injury: Invading Province of Jury. It is competent for a medical expert to give his own opinion, in view of the statement of facts, that a certain injury was the cause of the subsequent diseased condition of the injured person, even though his opinion may go to the very issue on trial. The province of the jury is not invaded by permitting him to give his opinion as to what caused nervous prostration shown to exist in the injured person, since a knowledge of what caused that disease is peculiar to medical experts, being a matter of technical science.

10. ——: Hired Expert. Where the fact that the expert was a hired witness is disclosed to the jury, that fact does not render him incompetent to testify.

Appeal from Cass Circuit Court.—*Hon. Wm. L. Jarrott*, Judge.

AFFIRMED.

*Frank Hagerman, R. T. Railey* and *John H. Lucas* for appellant.

(1) Under the circumstances in this case, defendant, at time and place of accident, owed to plaintiff the duty of exercising ordinary care. Ray's Neg. Imp. Duties (Passenger), sec. 33, p. 95; 4 Elliott on Railroad, sec. 1590, pp. 2477-8-9; Kelly v. Railroad, 112 N. Y. 443; Laflin v. Railroad, 106 N. Y. 139; Cross v. Railroad, 69 Mich. 367; Buenemann v. Railroad, 32 Minn. 392; Railroad v. Gross, 21 S. W. 186; Moore v. Railroad, 84 Mo. 487. The case, however, was tried in the court below upon the above theory of law, as will appear from a perusal of plaintiff's instructions and defendant's instructions. (2) The mere fact that the platform in controversy fell and that after the wreck some defects were found in the material, does not authorize a recovery upon the part of plaintiff. 3 Elliott on Railroad, sec. 1308; Sack v. Dolese, 27 N. E. 64; Pierce on Railroad, 383; 2 Rorer on Railroad, 1200-1201; Ray's Neg. Imp. Duties (Personal), 133; Railroad v. Bates, 45 N. E. 111; Krampe v. St. L. B. Ass'n, 59 Mo. App. 283; Moss v. Railroad, 49 Mo. 170; Murphy v. Railroad, 71 Mo. 202; Roblin v. Railroad, 119 Mo. 484; Ballou v. Railroad, 5 Am. and Eng. R. R. Cases, 486. (3) The evidence discloses that large crowds had been habitually passing over this identical section which fell out, without injury. The defendant had not only employed competent men to do so, but they had actually used, more than ordinary care in inspecting this platform. Under the circumstances defendant was guilty of no negligence. (4) The court committed reversible error in permitting Dr. Kuhn to invade the province of the jury and testify that Mrs. Wood had neurasthenia, and that, in his opinion, the fall which she sustained when the platform fell, caused said disease. State v. Palmer, 61 S. W. 657; Graney v. Railroad, 157 Mo. 682; Langston v. Railroad, 147 Mo. 465; Boettger v. Iron Co., 136 Mo. 536; Benjamin v. Railroad, 133 Mo. 288; King v. Railroad, 98 Mo. 240; Gutridge v. Railroad, 94 Mo. 472; Eubank v. Edina, 88 Mo. 655; Koons v. Railroad, 65 Mo.

597; Gavisk v. Railroad, 49 Mo. 276; Benjamin v. Railroad, 50 Mo. App. 610; Muff v. Railroad, 22 Mo. App. 584; Railroad v. Smith, 61 S. W. 3; Brown v. Mitchell, 31 S. W. 628; Railroad v. Sheldon, 51 Pac. 808; Jones v. Portland, 50 N. W. 731; Briggs v. Railroad, 53 N. W. 1019; Lawson on Exp. Ev., 30; Rogers on Exp. Tes. (Last Ed.), sec. 53, pp. 127-8-9; Holt v. Railroad, 84 Mo. App. 445; Am. B. Ass'n v. Talbot, 141 Mo. 682; Laflin v. Railroad, 106 N. Y. 136.

*Wallace, Wallace & Culbertson* for respondent.

(1) There was abundant evidence of negligence to sustain the verdict. Mullen v. St. John, 57 N. Y. 567; Thomas v. Tel. Co., 100 Mass. 156; Scott v. Dock Co., 3 Hurl. & Colt 596; Burn v. Boadle, 2 Hurl. & Colt 722; Koelsch v. Philadelphia Co., 152 Pa. St. 355; Judson v. Giant Powder Co., 107 Cal. 549; Tally v. Ayers, 3 Sneed 677; Seiter v. Bischoff, 63 Mo. App. 157; Minster v. Railroad, 53 Mo. App. 276; Shepard v. Railroad, 20 W. R. 705; Warren v. Kauffman, 2 Phila. 259; Yerkes v. Packet Co., 7 Mo. App. 265; Sharp v. Railroad, 114 Mo. 94; Jordon v. Railroad, 165 Mass. 345; Youmans v. Navigation Co., 44 Cal. 72; Railroad v. Philips, 49 Ill. 234; Lyons v. Rosenthal, 11 Hun 46; Railroad v. Mahone, 63 Md. 135; Simson v. Omnibus Co., L. R. 8 C. P. 390; Kearney v. Railroad, L. R. 5 Q. B. 411; Sheridan v. Foley, 58 N. J. L. 230; Rose v. Transportation Co., 11 Fed. 438; Hipsley v. Railroad, 88 Mo. 348; Guttridge v. Railroad, 94 Mo. 468; Swadley v. Railroad, 118 Mo. 268. (2) The court did not err in permitting Dr. Kuhn to give his opinion as to the cause of the plaintiff's condition. Greenleaf on Evidence, sec. 440; Donnelly v. Railroad, 70 Minn. 278; McLain v. Railroad, 116 N. Y. 468; Stouter v. Railroad, 127 N. Y. 651; Filer v. Railroad, 49 N. Y. 42; Flaherty v. Powers, 167 Mass. 61; Turner v. Newburg, 109 N. Y. 308; Decatur v. Fisher, 63 Ill. 241; Commonwealth v. Mullins, 2 Allen (Mass.)

295; Tracy v. Railroad, 63 N. Y. Supp. 342; Stout v. Ins. Co., 130 Cal. 471; Railroad v. Seymour, 92 Md. 425; Railroad v. Laws, 61 S .W. 498; Smiley v. Railroad, 160 Mo. 639; Railroad v. Roller, 100 Fed. 738; Roark v. Greeno, 61 Kan. 299; Railroad v. Holsapple, 12 Ind. App. 306; Crouse v. Railroad, 102 Wis. 204; Holman v. Railroad, 114 Mich. 214; Chatsworth v. Eliza Rowe, 166 Ill. 114; Quinn v. O'Keefe, 41 N. Y. Supp. 116 (9 App. Div. 68); McKeon v. Railroad, 94 Wis. 483; Bowen v. Railroad, 89 Hun 594; Friess v. Railroad, 67 Hun 211; Williams v. State, 64 Md. 393; Torpedo Co. v. Fishburn, 61 Ohio St. 608; Commonwealth v. Thompson, 159 Mass. 56; Indemnity Co. v. Dorgan, 58 Fed. 945; Bram v. United States, 168 U. S. 569; Johnson v. St. G. & L. Co., 146 N. Y. 152; Hopt v. Utah, 120 U. S. 436; Railroad v. Burnett, 80 Tex. 538; Railroad v. Thompson, 75 Tex. 501; Manufacturing Co. v. Mulvany, 168 Ill. 311; Chamberlain v. Light & Power Co., 158 Mo. 1; Greenleaf on Evidence, sec. 440.

GANTT, P. J.—This is an action for damages for personal injuries alleged to have been caused by the negligence of defendant.

The petition states that the defendant prior to and on the sixth day of October, 1897, was a common carrier of passengers for hire in Kansas City, Missouri, and from Kansas City to Independence, and as such owned, operated and controlled a system of cable street railways on various streets in Kansas City, one of its said lines extending along Fifteenth street in said city, and that it also owned and operated an electric railway from Kansas City to Independence; that said electric railway was operated by defendant in connection with its cable system in Kansas City, and at the western terminus of said electric railway near Askew avenue and Fifteenth street passengers were transferred by defendant by continued right of transportation sold by defendant from said Fifteenth street line to said electric rail-

way and thence to Independence.    That as such common carrier defendant owned, operated and controlled a certain depot at the western terminus of said electric railway, together with the platform in and about said depot, which said platform and depot were used by the passengers of defendant on said electric railway on said Fifteenth street line in transferring from one of said lines to the other; that on the north and northeast side of said depot there was at the time and on the date already mentioned a wooden structure or platform upon which certain timbers of said structure of the rails of defendant's said electric railway rested and its cars were caused to stand for convenience of its passengers in taking passage upon or alighting from its cars, which said structure was covered with wooden planks extending up to and against said depot and making a continuous floorway from said depot to its said cars, and over which passengers passed in boarding or alighting from its said cars in transferring from one of its said lines to the other; that on said sixth day of October, 1897, the plaintiff, Mrs. Annie Wood, was a passenger on a ticket purchased by her from defendant on its Fifteenth street line entitling her to continuous passage over said electric railway from Kansas City to Independence, and had been carried on said Fifteenth street line to said depot, and while transferring from said Fifteenth street line to said electric railway, and while in the exercise of due care and caution on her part, she came upon said platform at said depot, and was about to board one of defendant's electric cars then and there standing at said depot for the reception of passengers, when said platform gave away and fell, and she was precipitated with great force to the ground; that said platform was at this point sixteen feet high, and she was thrown this distance suddenly and violently to the ground beneath; that by said fall she was severely and permanently injured, in this, to-wit: her left hip was bruised, wounded and sprained; her left side wounded and bruised and

her left arm sprained and bruised and permanently injured; the back of her head hurt and wounded, rendering her unconscious and her nervous system greatly and permanently injured; she has suffered great pain and mental anguish and will continue to suffer the same in the future; that said injuries were caused by the falling of said platform, and the falling and giving away of said platform was caused by the negligence of defendant in carelessly and negligently permitting the timbers and supports of said platform to become rotten, decayed, weakened and in unsafe condition and in permitting it to remain in such defective condition, which said rotten and unsafe condition was known to defendant or by the exercise of ordinary care and diligence could have been known to it in time to have repaired the same before such injury. Plaintiff states she was damaged by the said negligence of defendant in the sum of $25,000.

The answer was a general denial.

Plaintiff recovered a verdict and judgment for $5,500, and defendant appeals. After the appeal was filed in this court plaintiff died and the cause has been revived in the name of her administrator, John D. Wood.

The evidence established that Mrs. Wood, the plaintiff, was a passenger on defendant's Fifteenth street cable line, having a ticket from Kansas City to Independence, and when she reached the depot of defendant's electric car line, left the cable car to take the electric car. The platform was crowded on account of the fall festivities that week, but the crowd was not greater than usual on such occasions. While attempting to reach her car, a section of the platform about sixteen feet by ten or twelve feet fell, and about forty people were carried down with it. The platform was built over a ravine on piles driven in the ground, and from sixteen to twenty-three feet above the ground. Water and mud usually accumulated under the platform. The section of the platform that fell was not covered and caught the rain that ran off of the shed.

On the part of plaintiff the evidence tended to prove it was built in 1887, ten years prior to the accident. On the part of defendant, that this broken girder was put in in 1893. The timbers and flooring were soft pine. There was testimony that the life of pine wood exposed as this was is from seven to nine years, and that it would rot sooner over a wet place like that under this platform. A number of witnesses, who were at the scene of the wreck that night and early next morning, testified that the sills under the section that fell were rotten or decayed; that the stringer at the east end of the hole was doty and the joists that rested on it plowed their way through it, and that the joists on which the flooring rested were also rotten. Mr. Crandall, who had been in the lumber business for twenty-five years, examined the joists and stringers next morning and said that he took his thumb and finger and pulled off pieces of the rotten wood and dug into the joists an inch or two with his knife. Mr. Kennedy's evidence was to the same effect. He was there immediately after the accident while they were taking the people out of the hole. He said that the joist that laid on the sill as it went down broke through the sill and sloughed it off, crushed down through it, digging into the sill three or four inches. That the sill was rotten and doty. Other witnesses, Gurney, Kreisher, Baldwin, Woodson, DeCeele and A. M. Hail testified to the rotten and decayed condition of the timbers. Clements, a builder, was on the platform when it fell. He examined the broken girder on the east end of the hole and it was rotten. It was a dry rot from the center to within an inch and a half of the edge and rotten on top. "You could punch a hole in it with an umbrella." That the proper way to have tested it was to go under the platform with a ladder and test the timbers by sounding them with a hammer. That taking a crowbar and sounding from the top was not the proper way.

Miss Beulah Vincent testified she was the daughter of the plaintiff and was with her mother at the time the

platform fell and fell with her mother. Some of the crowd fell on her and her mother. Her mother was rendered unconscious by the fall. Some gentleman helped her up. They got her and her mother up on the platform and into the waiting room. She was assisted on an electric car by Mr. Gurney and Mr. Crump and when they reached Independence Dr. Wood met them with a carriage and took them home. Plaintiff was in bed two weeks and did not have the use of her limbs. Was not able to go about for a month. Has suffered pain continually in the back of her head and neck ever since the accident. Had what she called a drawing sensation in the back of her head and neck. Had grown worse all the time. Before the injury was in good health and did her house-work, but since then had not been able to do anything. Had to take medicine to induce sleep and then did not get restful sleep.

Dr. W. Kuhn testified as an expert. He was a graduate of Jefferson Medical College, Philadelphia, in the class of 1884. He occupied the chair of nervous and mental diseases in two medical colleges in Kansas City. He testified that in 1899 he gave the plaintiff a thorough examination and found her suffering from a clear, well-defined case of nervous prostration or neurasthenia as called by the medical profession. That he had recently examined her again and she was worse than at the former examination. That the disease is chronic in its nature. That the treatment for this disease is rest, change of climate, removal of irritating cause rather than medicine. He testified that the disease may be caused by grief or death in the family, shock, sudden fright, injuries, anything that profoundly depresses the general system or the nervous system. That plaintiff's condition could have been caused by the shock of the injury received by her fall at the depot and in his opinion was caused by it.

No other physician testified in the case. Two phy-

sicians appointed by the court at the instance of defendant did not testify.

The instructions are not seriously challenged in this court, and from a careful reading of them we discover no ground of objection to those given for plaintiff, and those given for defendant were such as it asked and were exceedingly favorable to defendant.

Two grounds for reversal are urged in this court:

First, that defendant was guilty of no negligence, as shown by the record in this case.

Second, that the court erred in permitting Dr. Kuhn, over the objection of defendant, to come into the case two years after the accident at $75 a day and give the jury his opinion, after having stated all the facts, to the effect that plaintiff was entitled to recover.

I. There was substantial evidence upon which to submit the case to the jury as to the defendant's negligence in permitting the sills and joists of the platform to become rotten, decayed and unsafe.

The testimony on the part of plaintiff showed the sills had become rotten and doty, and that a reasonable inspection would have disclosed their unsafe condition. It is true defendant offered evidence that it had caused the platform to be inspected by Mr. Butts, its engineer, from the top of the platform, with a crowbar with a sharp point to it, but did not inspect the timbers from below by sounding them. This witness also testified that the sill was not rotten or doty, but was sound. But granting that Mr. Butts did so testify, this did not conclude the plaintiff. She was entitled to have the jury weigh the credibility of this witness, especially as he was directly contradicted by a number of witnesses as to the condition of the sill, all of them testifying it was rotten and doty. [Hipsley v. Railroad, 88 Mo. 348.]

Unquestionably it is the law that "it is the duty of a railroad company, a common carrier of passengers, to keep its stations, platforms and approaches in such a

condition that passengers who have occasion to use them for the purpose for which they are designed can do so in safety, and a passenger who is injured by a breach of this duty without contributory negligence on his part may maintain an action for damages against the company.'' [Fullerton v. Fordyce, 121 Mo. 1; 4 Elliott on Railroads, p. 2589, sec. 1641.]

Bearing the relation which plaintiff did to the defendant, having purchased a through ticket to Independence, and required, as she was, to transfer at the Fifteenth street station to get on the electric car, and in so doing to go upon defendant's platform provided for that purpose, she was entitled to the care which defendant owed to a passenger. [Jordan v. Railroad, 165 Mass. 346; 2 Wood on Railways (Ed. 1894), sec. 310; Waller v. Railroad, 59 Mo. App. 429; Dougherty v. Railroad, 81 Mo. 325; Fullerton v. Fordyce, 121 Mo. 10; Hutchinson on Carriers (2 Ed.), sec. 521a; Dodge v. Steamship Co., 148 Mass. 214; Railroad v. Lucas, 119 Ind. 583-589.]

There is and indeed can be no question of contributory negligence in the case.

The plaintiff was entitled by her through ticket to go upon the platform to take the electric car. She went upon the invitation of defendant and by virtue of her contract, and from this contract flowed the duty of defendant to keep its platform in such a condition that plaintiff could pass safely over it to the electric car, and the result shows it was not sufficient from the fact that it broke down and precipitated plaintiff into the hole sixteen feet below. The evidence on the part of plaintiff disclosed that the substructure of the platform under the floor was rotten and doty, and not sufficient to support the weight of the crowd which, like plaintiff, was there to take passage on the train. There was evidence that these timbers could easily have been inspected by going under the platform and taking a ladder and sounding the joists and stringers with a hammer. When all

these facts were shown the plaintiff had established a prima facie case.

Nor did the evidence on behalf of defendant require the court to give a peremptory instruction for defendant. While this evidence tended to show that defendant had caused the timbers which broke to be inspected, that evidence was for the consideration of the jury. The credibility of the witnesses who detailed it was to be determined by the jury. That witness was contradicted by other witnesses as to the condition of the timbers immediately after the fall of the platform. Plaintiff's witnesses testified they were rotten and doty, and Mr. Butts that they were sound. This was a material fact in the case. Upon the soundness or unsoundness of these timbers depended the safety of the platform, and their rotten and doty condition was the predicate of the charge of negligence in permitting them to remain so when by ordinary care and inspection this condition could have been observed.

This then presented a sharp conflict. Again defendant's witness testified how he inspected these timbers, and plaintiff's witness, an old dealer in lumber and a carpenter, testified that this was not the proper way of testing the soundness or unsoundness of the timbers. This also presented a question of fact, in connection with the greatly preponderating evidence of unsoundness, and it was for the jury to determine whether the inspection as detailed was a reasonable one in the circumstances.

In Hipsley v. Railroad, 88 Mo. 352, the defendant to overthrow the prima facie case of plaintiff put in evidence a number of witnesses as to the soundness of a rail on a railroad track, by the breaking of which the train was derailed. They testified it was a sound, smooth rail and well ballasted; that the ties were sound oak ties and the rail well spiked to the ties; that the break was fresh and disclosed neither flaw nor other defect in the rail; that it was an extremely cold night,

etc. Upon this state of facts the circuit court took the case from the jury, but this court reversed the judgment, saying that ''the facts stated by defendant's witnesses, if established to the satisfaction of the jury, would unquestionably constitute a complete defense to plaintiff's action.'' But ''it was their province, and not that of the court, to pass upon the credibility of the witnesses and the weight to be given their evidence, and in doing this and giving the instruction objected to, the court invaded the province of the jury.'' [Citing Kenney v. Railroad, 80 Mo. 573; Gregory v. Chambers, 78 Mo. 298; Meyers v. Trust Co., 82 Mo. 237; Bryan v. Wear, 4 Mo. 106.]

The duty of maintaining a safe platform for the entering and alighting by passengers of their trains was a continuing one, and as the platform was its own property the duty of inspection from time to time devolved upon it to see that the platform was safe for its passengers and whether an inspection is reasonable depends upon the facts of the case. Many things must be considered, the construction, the materials composing the structure; its age and the uses to which it is put. The fact that large crowds might congregate on it; that human lives were endangered if it was not kept safe and sound, these and other varying circumstances must be taken into consideration. What would be ordinary care in one case might be gross negligence in another.

It certainly can not be said that a reasonable inspection could not have discovered the rotten and unsafe condition of these supporting timbers, neither can the court declare as a matter of law that the inspection to which defendant's servants testified was as a matter of law sufficient to exonerate defendant. We think the demurrer to the evidence was properly overruled. [Gutridge v. Railroad, 105 Mo. 527.]

II. But again. It is insisted that as Dr. Kuhn, the expert physician, testified that among the recognized

causes of nervous prostration or neurasthenia were "worry, grief or loss or death in the family, shock, sudden fright, injuries, anything that profoundly depresses the general system or the nervous system," the cause of plaintiff's nervous condition was and is entirely conjectural, and hence the verdict is without any substantial basis upon which it can stand; that neither the physician nor jury could determine from plaintiff's physical condition whether the worry, anxiety or injury caused her neurasthenia.

We think the argument is strained. The evidence in the case demonstrated that prior to the injury received by plaintiff by the fall of the platform she was in good health and did her household work. That in the fall she was rendered unconscious; that she received injuries on the back of her neck and head; that she had continued to have a drawing sensation in that region; that she was gradually growing worse. Dr. Kuhn testified that on two different occasions he had made a careful examination of the plaintiff and found her suffering from neurasthenia, or nervous prostration, and that on the last occasion he found she was worse than on the first.

He was asked a hypothetical question: Assuming that prior to the fall she was in good health; that in the fall she received an injury to her head; that she was rendered unconscious, and that she continued to have pain in her head, the pain being located in the back of her head, whether in his opinion the injury and fall were sufficient to produce neurasthenia with which he found her suffering when he made his examination of her, and he answered that in his opinion as a medical man they were. It is now insisted that there is no way of dissociating the effect of worry and anxiety from the effect produced by the injury from the fall. From this evidence we have a known and direct cause, to-wit, a fall and direct injury to the head, followed by a continuous pain in that region and sleeplessness and inability to do her ordinary household duties; a condition of nervous-

ness, followed by loss of flesh and that condition growing worse; conditions which the medical expert testified were sufficient to produce nervous prostration, and we are asked to say that because worry and anxiety might also cause her condition she can not recover.

We think the proposition untenable. Outside of the assumption of counsel that her condition was caused by worry and anxiety over her prospective litigation, we find no evidence upon which to attribute her trouble to worry and anxiety about her suit. There was evidence of a fall and injury to her head and neck in the spinal region and continuous suffering therefrom, and the physician gave it as his opinion that the fall and injury were the causes to which her nervous prostration were attributable. In view of this evidence we think the plaintiff established that she suffered a serious injury to her head, causing continuous occipital headache, and that resulted in nervousness and sleeplessness, loss of appetite and flesh, and this condition produced what the physician recognized as neurasthenia, and it was competent for the physician as a medical man placed in possession of these facts to attribute her condition to the injuries which she received to her nervous system, and it was not a conjecture for the jury in view of this evidence to say her injuries resulted from her fall. When a known and probable cause was thus shown, she will not be denied a recovery on the ground that some other cause or causes might also produce the same condition of bad health. The jury were justified in attributing it to the facts in evidence before them.

Neither is it correct to say that there were no physical conditions which enabled the physician to pronounce her disease neurasthenia. He made a careful examination and in his opinion that was her trouble. He learned from her of the fall and the nature of her suffering. When he was called to testify, the facts upon which he based his judgment had been developed before the jury, and thus placed in possession of a history of her case

by the facts assumed in the hypothetical question, with his knowledge of her condition acquired by examination, he had the basis for his opinion. Defendant insists that it had the right to insist that the prostration was caused by worry and anxiety. As to this it need only be said that doubtless defendant did so insist before the jury, but if it did not, it was not because the court did not allow it to do so, so far as this record discloses. It asked no instruction on that subject and it can not convict the circuit court of error in refusing it permission to do so, as no such point is preserved in the record. The contention that the cause of plaintiff's nervous prostration is too conjectural and speculative to sustain a verdict is without support and is not tenable.

III.   The remaining proposition is that the hypothetical question was improper. That question is in the words following:

"Q. Doctor, you stated in the first part of your examination that when you examined this plaintiff in your office last fall, previous to the other trial, you found that she had neurasthenia. Now, I will ask you this hypothetical question: Take it for granted that previous to October 6, 1897, Mrs. Wood, the plaintiff, was in good health; that something like a year before that she had malarial fever, from which she had entirely recovered; that on the sixth day of October she was standing on the platform in connection with some thirty or fifty other persons, and the platform went down with her and the other persons to a distance of something over sixteen feet, or about sixteen feet or more; that she fell in the pile there with the other persons; that by this fall she was rendered unconscious; that she was taken out of this place to which she fell—which was the ground, and a muddy, soft place below—falling along with some timbers which were fallen along with the people, and a portion of the platform falling diagonally along with them, or rather a portion of the platform falling along

with them, and as I said, she was rendered unconscious by this fall; that she was taken out; that she does not know herself to be hurt and regained consciousness some minutes afterwards when she was upon the depot platform above; that she received an injury in some way to her hip, which gave her pain then and for some time afterwards; and hurt her arm, which gave her pain for some time afterwards, and that in this fall her head received an injury which has pained her, and in her head she had pain since and has had it up to the time you made this examination, the pain being located in the back part of her head; that at the time of the injury she had quite a number of rubber hairpins in her hair, which was done up in the usual way, and that these hairpins were all broken, found to be broken immediately after the injury, I will get you to state whether or not the injury that I have described was, in your opinion— the injury and the fall—was, in your opinion, in her case, sufficient to produce the disease of neurasthenia, which you found her to be suffering with upon your examination at Kansas City last fall?''

To this question it was objected that it was simply calling upon the witness to give an opinion as to whether plaintiff was entitled to recover, and was not predicated on all the facts, and the question was one to be determined by the jury.

There can be no doubt that it is not allowable to permit an expert witness to give his opinion upon matters upon which men of common information are capable of forming a judgment. Many of the cases cited by appellant are clearly of this character, and do not reach the point now under consideration. As said by MAC-FARLANE, J., in Benjamin v. Railroad, 133 Mo. 288, ''an exception is made to the general rule [forbidding witnesses to give their opinions], and persons who, by experience, observation, or knowledge, are peculiarly qualified to draw conclusions from such facts, are for

the purpose of aiding the jury, permitted to give their opinion. The exception is allowed from necessity. An expert witness, in a manner, discharges the functions of a juror, and his evidence should never be admitted unless it is clear that the jurors themselves are not capable, from want of experience or knowledge of the subject, to draw correct conclusions from the facts proved.'' This is a correct statement of the general doctrine.

Now it must be conceded that the disease of neurasthenia or nervous prostration or nervous exhaustion, though one of the most serious character and causing great suffering, is little understood by the average person, either in its symptoms or the causes which produce it. Being an affection of the nervous system it may be said to lie peculiarly within the province of a medical expert to determine its existence and to ascertain its cause.

Certainly it can not be said that the average juror is as capable of determining from certain symptoms the existence of such a disease and its cause as a medical man who has made it a study. While the experience and learning of the physician might readily detect it, the ordinary man would know nothing of it. In a word, whether a man or woman is afflicted with neurasthenia and what produced it, is peculiarly a matter of scientific or technical knowledge. Hence, in this case, no objection was taken, and properly not, to the testimony of Dr. Kuhn as to the nature of this disease, and its general characteristics, or the usual causes producing it. Manifestly no one but a physician, and, we might add, one who has made a study of nervous troubles, is competent to speak intelligently on the subject. It was not a matter within the common knowledge of ordinary men.

The objection, narrowed down, is to the action of the court in permitting him, in view of the facts detailed in the hypothetical case, to give his opinion as to what caused the nervous prostration with which he found Mrs. Wood to be suffering. He was competent after his ex-

amination of her to say that was her disease. Made acquainted then as he was by the facts stated in the hypothetical case, was he or was he not competent to express an opinion as to the cause of said disease? The question is by no means a new one.

In Donnelly v. Railroad, 70 Minn. 278, the action was for damages for personal injuries. The main assignment of error related to the action of the trial court in permitting a hypothetical question propounded to a medical expert, calling for his opinion as to the cause of plaintiff's condition, based upon the evidence as to the manner in which she received her injury, the kind of injury inflicted, her subsequent condition and her bodily condition. It will be observed that it furnishes a legal parallel to the question now before us. The court said the objection was that the opinion sought from the expert called for *the cause* of the plaintiff's condition, and was not the subject of expert testimony, being the very question the jury were to pass upon—the same here. The court responded to that contention as follows:

"It is laid down in the books that a question to an expert witness should not be framed so as to invade the province of the jury; but the line of cleavage between what does and what does not invade the province of the jury is not capable of definite location by any exact rule applicable to all cases, without regard to the subject of inquiry. The mere fact that the opinion called for covers the very issue which the jury will have to pass upon is not conclusive that it is not the proper subject of expert or opinion evidence. For example, sanity or insanity is the subject of expert testimony, although that may be the sole issue to be determined by the jury. Neither do we appreciate the fine distinction sometimes sought to be drawn between asking the expert whether, in his opinion, certain causes might produce certain results, and asking him whether, in his opinion, they did produce certain results.

"It is well settled that the opinion of medical experts as to the cause of death are admissible, such opinions being founded either upon the personal knowledge of the facts of the case, or upon a statement of the nature of the injury or symptoms and nature of the disease as testified to by others.   [Rogers, Expert Testimony, sec. 49, and cases cited.]   There can be no difference in principle between an opinion as to the cause of physical ailments which have not resulted in death.   This court has held that in answering a hypothetical question embodying a person's assumed symptoms and conditions, as testified to by others, a medical expert may give his opinion as to the probability of recovery.   [Peterson v. Railroad, 38 Minn. 511, 39 N. W. 485.]   Also that a physician who has heard the testimony as to the manner in which the plaintiff was injured, the kind of injuries inflicted and his present bodily condition, may give an opinion, based on that evidence, as to the cause of the plaintiff's condition.   [Cooper v. Railroad, 54 Minn. 379.   This case is directly in point.]"   The learned court then goes on to comment on Briggs v. Railroad, 52 Minn. 36, and concludes by saying, "The writer of the opinion in that case probably used language which is too broad as a general proposition of law unless qualified or limited."   Counsel for defendant in this case relies upon the Briggs case as an authority for their contention, but it appears that the court which rendered it has since disapproved it.

Very apposite to this discussion is the opinion of the court of appeals of New York in McClain v. Railroad, 116 N. Y. 468:

"There was no error in the reception of the evidence referred to in the present case.   It was given as the judgment of the witness that the injury was the cause of the condition of the plaintiff, and that certain consequences would follow in relation to his physical health and condition, as the result of the injury, as indicated by such condition.   And the same may be said of the

exception taken to the reception of the answer of the doctor to the hypothetical question. Upon the state of facts assumed by the inquiry, it was competent for the witness to state that in his judgment the tremor and the impairment of the nervous system, with which the plaintiff was afflicted, was due to the injury. The facts upon which the question was based practically excluded all causes up to the time of the accident, and, therefore, the evidence called for was not speculative. It was offered to show not merely that the injury might produce the condition or that such a result was likely to follow, but that in view of such facts it did cause such condition.''

Without quoting at length from the following cases, they announce the same rule and hold that it is competent for an expert medical man to give his own opinion in view of the statement of facts, that the injury was the cause of the disease or condition found in the injured person: Stouter v. Railroad, 127 N. Y. 661; Filer v. Railroad, 49 N. Y. 42; Flaherty v. Powers, 167 Mass. 61; Turner v. Newburg, 109 N. Y. 308; City of Decatur v. Fisher, 63 Ill. 41; Com. v. Mullins, 2 Allen (Mass.) 295; Tracey v. Railroad, 63 N. Y. Supp. 242; Stout v. Ins. Co., 130 Cal. 471; Railroad v. Seymour, 92 Md. 425; Railroad v. Laws, 61 S. W. 498.

In Missouri the rule is well established that a medical expert may give his opinion as to the cause of a diseased condition or that it will be permanent or the cause of death, upon a hypothetical statement of the facts. And as to the proposition that his opinion may go to the very issue on trial, it was ruled in State v. Wright, 134 Mo. 404, that a medical expert may give his opinion as to the sanity or insanity of the defendant, having for a basis the hypothetical case, together with what he had learned from an examination of the defendant, though this is the sole issue to be decided by the jury. [State v. Welsor, 117 Mo. 580-1; State v. Minton, 116 Mo. 605.]

Indeed, nothing is better settled in the criminal practice, than that a medical witness may describe the wounds which he observed upon a dead person and give his opinion whether one or more of them produced the death or were necessarily mortal.

The cases are too numerous to cite. And it is the universal rule in this country that a medical expert may give his opinion as to the cause of death, notwithstanding that is one of the issues, and sometimes the only issue in the case. [Smiley v. Railroad, 160 Mo. 629; State v. Chiles, 44 So. Car. 338; Powell v. State, 13 Tex. App. 244; Mitchell v. State, 58 Ala. 417; Simon v. State, 108 Ala. 27; Newton v. State, 21 Fla. 102; State v. Tippet, 94 Iowa 649; State v. Smith, 32 Maine 369.]

The industry of counsel has collated a large number of decisions in this State in which questions as to matters within the ordinary experience of life, questions which the average juryman in possession of the facts could determine equally as well as an expert, and they were excluded on this ground. Such, for instance, as Graney v. Railroad, 157 Mo. 682, whether it was possible for a boy to fall in a certain manner without striking the cars; or Langston v. Railroad. 147 Mo. 465, in which it was proposed to ask the opinion of a witness as to the competency of a servant; or Eubank v. Edina, 88 Mo. 650, in which the inquiry was whether a sidewalk was in a reasonably safe condition.

An examination of the whole list will disclose that they differ wholly from a case like the one under consideration, wherein the disease and its causes relate to a question of technical science or knowledge of which an expert only can speak intelligently, and such peculiarly is a question as to the existence of a nervous disease like neurasthenia and its causes. The question propounded falls clearly within the exception noted in Benjamin v. Railroad, 133 Mo. 288, and there was no error in permitting it to be asked or answered by the expert medical witness.

As to the expert being a hired witness, the fact that he was paid his fee as an expert for the examination of the plaintiff, was fully disclosed by the witness himself on a question propounded by the plaintiff's attorney, and the jury had that fact before them in weighing his credibility.

It presents no ground of incompetency of the witness.

The nature of the injuries, the results that followed it, were all before the jury, and we can not say that the amount of the verdict gives evidence of passion or prejudice.

The judgment of the circuit court is affirmed. *Burgess* and *Fox, JJ.,* concur.